James Tucker, against Workers' Compensation Commission, 4100169. Good morning. May it please the Court, Counsel Matt Kelly on behalf of Petitioner Jim Tucker. The opposing counsel in his brief suggested that I have been making the same argument over and over again on several levels of the appeal. And he's correct, I have. And I suspect he raises that in his brief for a couple of reasons. One, because he's tired of hearing my argument. And two, because he's concerned that at some point someone might pay some heed to it. He may even raise that again today. I suspect that's correct. I don't come before the appellate court very often. I don't come here if I don't think I have a good reason to be here. And I'm here today. When did he start work? Monday, the 28th of January, I believe, 2000. How many days did he work? He worked Monday, Tuesday, Wednesday, Thursday of that first week. Fourteen hours every day? Well, no, he did not. There was no heat in the basement. He couldn't complete his job duties at any given time. And he told John Hergert he couldn't complete his job duties because there was no heat in the basement. And yet John Hergert kept calling him back to the job site to work again. John Hergert was the individual to whom Mr. Tucker turned his time in. John Hergert was also the individual to whom Mr. Tucker advised there was no heat in the basement. And that segues me to the one quote I would like to read to the court. I put it in my reply brief. I think the whole case comes down to this one quote. It's Mr. Glosser's handwritten log notes from the day after my client's injury when allegedly John Hergert came to the job site to discuss my client's fraudulent workers' compensation claim. And Phil Glosser writes, John, with mechanical insulation, was here in regard to heat in basement. And I explained how one heater would not do trick. If heat was not necessary in the basement in order for Jim Tucker to complete his job duties, Phil Glosser's log note from the day after the accident would not read in that manner. One heater would not do trick. The only implication from that phrase is that, in fact, heat was necessary in the basement in order for Jim Tucker to complete his job duties. Let's assume that's true. Doesn't this case really turn on the credibility of the witnesses and of the claimant? Because, as you know, the burden is on the claimant to prove his or her case. And admittedly, unless you're arguing against it now, it appears that the claimant falsified his time records, didn't he not? Again, if you read this statement and take this statement for what it's worth, no, he did not falsify his time records. If heat was necessary in the basement for Jim Tucker to perform his job duties, then Jim Tucker was telling John Hergert that. Jim Tucker was turning his time into John Hergert. John Hergert was showing up at the job site in order to figure out how come there was no heat in the basement. John Hergert knew full well Jim Tucker wasn't getting the full day of work in. John Hergert was the one to whom Jim Tucker was turning in his time. If Jim Tucker was falsifying his time records, John Hergert, his supervisor, was complicit in that behavior. So how does that help his credibility? He says he's working 40 hours a week, but he's not, right? Well, again, with the employer's full knowledge and understanding, the employer keeps calling him back to the job site and saying, we need you to do this insulation work. Jim Tucker gets to the job site, there's no heat in the basement, he can't complete his job duties. He tells John Hergert he can't complete his job duties. John Hergert knows he can't complete his job duties. If he allows the time records to go through, but because there's a problem with the supervisor and the claimant together, are falsifying records, that means the claimant should win? Again, I don't know how we ever got to the point where there was a formal legal conclusion that my client falsified time records. Nobody pressed charges, nobody requested a reimbursement. My client may not have been able to work a full 10-hour day, but he was being called back to the job site with knowledge by his employer that he was not able to work a full 10-hour day. How does that impact my client's credibility, but not John Hergert's credibility, who is complicit in and orchestrating this falsification of time records? Didn't he also turn in time for driving back and forth to work? I don't believe so, Your Honor. As far as I know, his time strictly was turned in for the time he was at the job site, as far as I know. And once again, I appreciate that my client had some issues. He's not a very likable fellow, which is why I suspect I'm here in the first place. Were any other workers present at the time this happened? When he fell on the stairs? No. Which again... Nobody was present. Well, there were other workers on the job site at that time, but there was nobody in the stairwell at that point in the day. Now, again... Did they testify or did they talk about that? None of them. Pardon? Phil Glosser testified that he had a crew of carpenters in the stairwell where my client fell every minute of the day that day, and as such, there's no way my client could have fallen in the stairwell. But once again, if you go back and look at Phil Glosser's handwritten notes, he's got a detailed day-by-day outline of what employees, what tradesmen, he had doing what, where in the building. He's got carpenters in the stairwells on the Monday before my client fell. He's got carpenters in the stairwells on the Tuesday before my client fell. Did Glosser and Harvick interview every one of these witnesses? Well, according to them, they did. They did that on the day... Did you? No, I didn't. Why not? My client said it was an unwitnessed fall, Your Honor. I'm not sure why I would go searching for witnesses when my client's telling me from the get-go that there were no witnesses. He'd had other claims that he'd filed, too, as expected. Worker's comp? In 1987, 1999, and 2000. That's correct, as far as I know. Wasn't exactly truthful to his own treating physician, was he, about prior back injuries? Dr. Rutz wasn't too impressed with that, was he? Dr. Rutz never expressed an opinion on causation. Mr. Tucker was not the world's best physician. Isn't Rutz of the mind that either of the two prior injuries could have caused a ruptured disc in the cervical spine? To the best of my knowledge, Dr. Rutz did not express any opinion. He expressed that such incidents could cause ruptured discs. I don't believe he expressed an opinion that in this particular case, after at least seven years of intervening unrestricted employment as a pipe fitter, that it did so in this particular case. He wrote in his records your client wasn't even honest with you. That was the IME doctor, and that was Dr. Rutz's opinion. Presumably we didn't take Dr. Rutz's deposition, so I don't honestly know what Dr. Rutz had to say about all of that. Once again, I understand my client had some issues, but no one seems to pay attention to the fact that Phil Glosser and John Herger were caught unambiguously in deceptions to the court. For the sake of the argument that you have a point, in setting aside the credibility issue for the moment, what doctor opined a causal connection between this alleged accident and the medical condition of your client? Is that in the record? I think if you read Dr. Schenninger's reports, there is a causal connection. What does he say? I'm sorry, Your Honor, I don't have that available to me right here. How can you stand there and tell us that, and you don't even know? Well, if you bear a minute, I'll get Dr. Schenninger's report. It's your case. Where's your medical evidence? And I think also my client's testimony in and of itself also, when taken into consideration with the fact that he appeared in the emergency room on the day of the accident with a consistent history of injury, he saw his next doctor a week later with a consistent history of injury. I think that in and of itself is also sufficient to establish a causal connection. Thank you, Your Honor. I'm sorry, Your Honor, I should have had this. Is that on Dr. Schenninger? Correct, I have it. In summary, I feel this gentleman has a history of an injury as noted above. His symptoms suggest the presence of radicular irritation arising in both the cervical and lumbar spine and are consistent with the diagnosis of a cervical and or lumbar disc rupture. His symptoms are consistent with the lesions noted on the above study. The only history noted above is the history of the fall. I think that's fairly clear that Dr. Schenninger feels there's a causal connection. Doesn't he have a history of other injuries? He does have a history of some other injuries. Seven and 20 years before the state of accident, following which he was able to perform his job duties as a pipe fitter without restriction. His manual labor job duties as a pipe fitter without restriction, including on four other occasions for this particular respondent. In the two years before the state of accident, including on four other occasions for this particular respondent. Again, I cannot imagine medical causation is truly an issue for this body based on the time frame, the medical records, and Dr. Schenninger's report. I understand my client was not a very likable fellow, and I suppose that's why I'm here. Arbitrator White is a respected arbitrator. I think she took a disliking to my client, but I think she made a mistake in her ultimate conclusion. No one has yet, at the arbitration level, the commission level, or the circuit court level, addressed the blatant misstatements of fact by the defense's star witnesses. If an investigation into my client's alleged fall took place on February 7, 2008, is the only reference in Phil Glosser's log note is that John,  and I explained how, and if heat was not necessary, and because heat was not necessary, my client's work was substandard, does his note go on to say I explained how one heater would not do the trick? No, those notes do not read in that. Here's the issue that we're grappling with. Stop and take an objective look at it. It's a manifest way to the evidence argument that we're looking at. Right, and so you're saying, all right, maybe my client, the commission, there may be reasons why the commission could find my client to be less than credible, but there should also be obvious reasons why the commission would find the other witnesses not credible. So how does that equate to you then winning the case? That's not my argument, Your Honor. What is the argument? My argument is that my client's not a very likable fellow, but once you figure out that Phil Glosser and John Hergert have lied, then my client's credibility is reestablished. Your client's credibility is reestablished when he lies to his own doctor? He did. Again, we don't know what exactly he told Dr. Rutz. We know what's in Dr. Rutz's records. Well, I mean, so Dr. Rutz's credibility is an issue now too? What did he do wrong? You know what? I don't know anything about what Dr. Rutz's opinions honestly are than what he put in his written report. I just don't understand how. So much of his written report is in evidence. I don't understand how respondents can get away with, as far as I can tell, based on Phil Glosser's handwritten log notes prepared contemporaneously with the issues. I don't get how respondents' witnesses can misstate the truth blatantly. There's no other explanation for it if you read Phil Glosser's notes and look at his testimony and John Hergert's testimony, but that they lied. I don't get how they can do that, and no one cares. I don't understand that. Is there a burden on them to prove anything? No, but once you figure out they've lied, then the issues are clear. And what did they lie about? They say they conducted an investigation into my client's injuries on the day after my client's date of accident, and they say that's the sole reason that John Hergert came to the job site on the day after my client's date of accident, was in order to conduct an investigation into my client's presumably fraudulent fall on the stairs. If that's what John Hergert came to the job site to do, then why does Phil Glosser's note read the way it reads? Why does it say John Hergert is here to discuss heat in the basement and I told him one heater wouldn't do the trick? All we have is this note. Let's say you're right. Isn't that why you should have interviewed these people to say, did they talk to you? You understand, I didn't know of the existence of this note. These are respondents' witnesses. I didn't know of the existence of these notes. I didn't know these people were going to testify. Well, did you have an opportunity to say, Mr. Arbitrator, do we have a little time to go into this? Again, it was two pages of handwritten notes, Your Honor. I did my best under the circumstances to cross-examine the witnesses with the information I was presented at the time. But in hindsight, I'm not sure I needed to do too much more cross-examination. If you read Phil Glosser's notes and you look at his testimony about the interview regarding my client's injuries and the crew of carpenters in the stairwell all day long so that my client couldn't possibly have fallen down in the stairs, there is no way to reconcile their testimony with the notes Phil Glosser prepared contemporaneously with the actions that are noted in his log. They do not reconcile. There is no way to say, I met with John Herger to talk about heat and told him one heater in the basement wouldn't be sufficient and then conclude that these people came to the job site to conduct a thorough investigation into my client's alleged fraudulent workers' compensation injuries. They do not reconcile. There is no story you can craft that reconciles how they testified with what Phil Glosser wrote. And I don't get how, and once you figure out that Phil Glosser and John Herger are misstating the truth, my client's testimony about the alleged falsification of time dissipates, the heat necessary to complete my client's job duties dissipates, all of those issues dissipate once you figure out that Phil Glosser and John Herger were not testifying honestly. And I don't get how, again, there's no way to read all that consistently. No way. Mr. Weinstock has not presented to this court any way to read these quotes consistently with their live testimony. And I don't know how that's an acceptable manner of behavior for a respondent to engage in with no one taking note of that situation. And it seems to me that that clearly gives the court the basis for concluding that the decision of the arbitrator, as affirmed by the circuit court and the commission, is against the manifest weight of the evidence. If their star witness's testimony is an uncontradicted lie, and again, every one of Phil Glosser's other log notes corroborates my client's statements. At trial, before we knew of the existence of those log notes, and to the adjuster six days after the accident, my client said there were a couple of welders in the stairwell. Phil Glosser's log notes confirm that. Again, everything about those log notes. What did they say about it? Phil Glosser's log notes on the. . . Well, what did the other witnesses say? He said, again, Phil Glosser said there was a. . . Well, I didn't say what Glosser said. What did you find that they said? I'm sorry, I'm not sure I understand the question. Your time's up. You'll have time on rebuttal. Very good. Thank you. Counsel, please. May it please the Court, Counsel, my name is Brian Weinstein. I represent Mechanical Insulation, and I'd like to thank you for the opportunity to hear our case today. We believe that the manifest weight of the evidence reveals that the arbitrator in the unanimous commission is correct, and that the petitioner failed to prove his case  to show that an accident arose out of the blue. It arose out of and within the course and scope of the employment on February 6, 2008. In addition, we believe that the same record and evidence, the manifest weight of that evidence, confirms the arbitrator in the unanimous commission's decision that the petitioner himself is not a credible witness. Justice Stewart, just to jump ahead real quick, you asked a question with regard to driving. The claimant specifically testified at the trial that he did not work a full 40-hour work week, and even though he did not work a full 40-hour work week, he still submitted time for working that full 40-hour work week. The issue about driving to and from work, he gave as a justification and stated that, since I had to drive a long distance to and from work, I felt justified in submitting 40 hours worth of time, even though that is not part of my union contract. I'm not entitled to get hours paid for driving to and from work in my union contract. But that was his explanation as to why he padded the time on his hours. What do you make of this argument in response to that, that the supervisor knew he was not on the job site 40 hours, but let the records go in as submitted? Well, I would say that the supervisor did not know that he was not there for the full 40 hours a week, because what the supervisor knew was that this gentleman had come to Phil and asked him if he could stay late to work 10-hour days, and Mr. Glosser said that was acceptable, and that was Mr. Herdert's knowledge of what was going on. This did not come to light until after this incident of February 6, 2008, when Mr. Herdert had gone back to the job site to find out if this individual had fallen. And if you see notations in the record from a Rick McMillan, who later on was contacted and advised that the petitioner at no time ever even appeared at work before 8 o'clock in the morning. And then they found out that going back and looking at the records, that these time cards were actually falsified, which then led to an immediate termination for falsification of the time cards and for poor workmanship, which the union, his own union, did not dispute and accepted. And the union not only accepted and did not dispute it, but then hired their own union workers and bought product from my client to go back into the basement, repair all the shoddy work, finish the job, all of which was done with no heat in the basement. So you're saying in summary then there was no supervisor on the job site at all hours to be able to verify what the claimant was representing. My client was a subcontractor. Phil Glosser's company, Petrie-Kuhn, was a general contractor. My client was not on the job site 24 hours a day, 7 days a week, monitoring... So the claimant's sort of on the honor system. He's supposed to submit accurate records, and obviously he didn't. Exactly. And he admits that in the record. He admits that he didn't work a full 40 hours a week, and he submitted time for 40 hours a week. What's your response to his argument that Glosser and the other gentleman are lying? Okay, well, let's take Glosser. Glosser works for Petrie-Kuhn. He does not work for my client. Glosser appeared voluntarily at the trial. It wasn't subpoenaed. Glosser has no benefit in the outcome of this case. So what you have to conclude is that the gentleman shows up on his own, raises his hand to tell the truth, and comes in and lies and commits perjury to subject himself to a crime. It makes no sense whatsoever. I mean, what's in it for him to do that? And with regard to Mr. Herger, Mr. Herger was seen by the arbitrator. Mr. Herger's testimony was taken by the arbitrator to be credible. And Mr. Herger is not engaged in some conspiracy theory with Mr. Glosser to conjure up some phony log notes. Mr. Glosser was not even given the duty to write a novel about the Reynolds Building in Macon County. He was simply making his own notations to refresh his memory, came into the hearing by which the exhibits, the trial exhibits, the log notes, were given to Petitioner before the hearing started, and he came in to supplement his log notes to refresh his memory about what happened on that day. Is there any medical evidence that supports the claimant's position? There is none. There is none. Dr. Rutz never gave an opinion about medical causation. You heard Petitioner's attorney read Dr. Schettinger's summation. There's nothing in there that says this event may cause or could have caused or did cause this episode. And not only that, but Dr. Schettinger filled out health insurance claim forms, which are in the record. And on the health insurance claim form, it states in box 10, is the patient's condition related to employment, current or previous? Dr. Schettinger marked the box no. What box did he mark? Box C that says patient's condition is related to, quote, other accident. Now, what you don't have, because I had a struggle getting these health insurance claim forms from Petitioner's attorney, is the back of the health insurance claim form. The back of the health insurance claim form is incorporated with the front, and on the back, in big black letters, says if there's any misrepresentation made on this form, it can result in civil and criminal penalties. So basically, Dr. Schettinger, if this truly is a workers' compensation accident, and he opined that it is, now subjected himself to a health insurance fraud by submitting those bills to the private health insurance company under the guise that this is not related to employment, but some other accident to get bills paid. But to get directly back to your point, there's nothing in his summation that says specifically, and Dr. Schettinger was picked by the Petitioner. Dr. Rutz, Justice Hoffman, did comment on the fact that he was not forthright, the Petitioner was not forthright with him, and I would also argue, as I did in my brief, that the Petitioner was not forthright with Dr. Schettinger either. Dr. Schettinger took a past medical history, and it says, I believe it says, none. I mean, this gentleman had not only had injured his neck before, he had gotten treatment for it, had a Missouri workers' compensation claim filed, two of them, but the one involving the neck, he even had a doctor testify for him in that case about problems with his neck. Now, getting back to the workers' compensation cases, originally when he gave his statement, the Petitioner stated that he only had one. It was 15 years ago. Well, when we came to trial, we introduced records of two from Missouri and two from Illinois. The two from Illinois were completely separate accidents. I believe one says body as a whole. I haven't seen the claim, or the settlement contract, so I don't know if it refers to the neck. And the Petitioner would have everyone here believe that the two claims in Illinois, even though there were two separate settlements with two separate accident dates and two separate injury numbers, claim numbers, are only one accident in Illinois. Even when presented and showed these documents at trial. There's also other inconsistencies from the Petitioner. The Petitioner says Dr. Raymond never returned him to work. Dr. Raymond did return him to work. He says that Dr. Gray didn't return him to work. Dr. Gray did return him to work. He tells Peggy at Dr. Gray's office, I'm not pursuing a workers' compensation claim. Seven days before, he hired an attorney, as documented by the dates on the application for adjustment of claim. How could he not know seven days after that he just hired an attorney to file a workers' compensation claim? Seven days later, he's at Dr. Gray's office telling his assistant, I'm not pursuing a workers' compensation claim, when in fact he is. So in sum, you can argue this is a simple case. It's up to the Commission to assess the credibility of the witnesses. It's up to them to assess the weight of the evidence, the medical evidence. They filed the claim and didn't prove the case. In sum, what I'm arguing is that the Petitioner's attorney would like for this court to go back and weigh the evidence, to go back and judge the credibility, to go back and make different inferences than the Commission, the Unanimous Commission, and an arbitrator, who actually saw all the live witnesses, saw them all testify, including the Petitioner, Berger, and Glosser, and make completely different inferences than what the arbitrator did in the Unanimous Commission. Thank you, counsel. Thank you. Briefly, Your Honors. Well, the arbitrator certainly made a very clear paragraph in saying she didn't believe your claimant. That's correct, Your Honor. She did. And I disagree with that for the reasons I previously stated. And as you will note in response to your question to Mr. Weinstock about the credibility of Mr. Glosser and Mr. Herbert, he didn't address the specifics of Mr. Glosser's lognosis compared to the specifics of Mr. Glosser and Mr. Herbert's testimony, because once again, I hate to reassert one more time, there is no way to reconcile their testimony with what Mr. Glosser wrote. It cannot be done. The only conclusion you can come to is that they lied. I understand you've all probably made up your mind with respect to my client's situation. Well, I don't want to make that assertion, but it seems to me there's been some making up of the minds with respect to my client's situation, and I just would ask... The record suggests he's not telling the truth in any instance. Well, right. And I guess all I would ask is for you to consider the dishonesty of the respondent in connection with the situation and honestly come to the conclusion that that is sufficient for you to conclude that the decision of the arbitrator was against the manifesto. Thank you. Thank you, counsel. The court will take the matter under advisement for disposition.